Okay, I've heard them a little loud, so I'm going to move this back. If you can't hear me, let me know. All right, we're going to go on to case number 22-30487, Calogero v. Shows, Cali & Walsh, and we'll begin with Margaret Woodward for Calogero. Before I begin my argument, I want to note I listened with some envy to the preceding cases, each of which seemed to have one principal issue. We have a lot of big issues on this appeal, and I plan to address standing and the statute of limitations with the limited time I have. However, if the Court would like to direct me in another direction, I'm happy to go wherever you would like to go. And so if you want me to start— Well, you should begin your time. I mean, I don't know why you haven't begun the time. Yeah, go ahead. All right. With that, I'll begin with the gateway issue of standing. When these defendants wrote to plaintiffs threatening suit on a contract that included a covenant against plaintiffs' homes, they created a legitimate risk that plaintiffs would lose their homes, and these plaintiffs were particularly vulnerable to that threat because they're widows in their 80s. Ms. Calogero and Ms. Randolph are in court seated in the first row. The 90-day or else clause in the Dunning letter made that an imminent risk of future harm sufficient to establish standing on its own. But additionally, both plaintiffs by undisputed affidavits showed that they had suffered profound emotional distress. They also showed they had suffered monetary damages. Ms. Calogero, in response to— What's your response to the contention that we can only consider what was pled in the original petition? I believe under Supreme Court precedent, given that we are in the summary judgment phase here, the court looks at the record at the stage of the proceedings presented. There are these affidavits in the record which show profound emotional distress. They also show monetary damages. Ms. Calogero, in response to the demand for a written answer to the Dunning letter, retained counsel and instructed her to write a certified letter to defendants. Other jurisdictions have held that the cost of a postage stamp amounts to a concrete injury. Ms. Randolph, of course, began making payments on a debt she probably didn't owe. Additionally, both plaintiffs suffered an invasion of privacy because although both plaintiffs had retained counsel and their letters of representation were in defendants' records, defendants improperly wrote directly to the plaintiffs, bypassing the buffer they had attempted to establish. All of these harms were among those Congress expressly sought to prevent in enacting the FDCPA. And in so doing, Congress hewed closely to harms recognized in American courts as providing the basis of lawsuits, such as invasion of privacy, intentional inflection of emotional distress, abuse of process, and more. We believe standing has been conclusively established on the record before this Court. But if the Court would like a fuller statement of plaintiffs' harms, because the issue is first arising on appeal, while we know we have the obligation to prove standing, we would like an opportunity. Well, I think what you're saying is it's not what's written in the complaint, or if it's in state court in the petition, but here in the complaint, it is what exists at the time. Yes. So even if you all didn't mention it very fulsomely in the original complaint, if you're saying at the time there was emotional distress or having sent a stamp or whatever, then that's enough.  That's what you have to show. So that's your argument. Okay. That is my argument, though I will say, if you were judging it on the face of the pleadings, the cases indicate that what we put in the pleadings was enough, because at that point you have to accept those allegations as saying — Well, your original complaint doesn't say emotional distress. It just says she was confused, and we have cases that say that's not good enough. That's true. Okay. That is true. It doesn't say anything about a stamp either. Luzhin, however, says you look at it at the procedural posture presented on appeal. Right, but there's two issues. There's the timing and then the pleading. Those are two different things in my mind. If they didn't have standing when the case was sued, that's a problem. If they had standing, but they just didn't plead it very well, that's the issue that your opponent says, ah, too bad, but you're saying, no, that's okay, as long as we eventually show it. I do believe it's okay, but I also believe that at the time that we filed our original complaint, before Ramirez was decided, if the issue had come up, we would have been given an opportunity by the district court to do more. In fact, were we given an opportunity to say more, there was much more to be said on these subjects. Okay. Well, I want to ask you about the statute of limitations issue. There's the discussion about which statute applies. I understand that. But there's also an argument by your opponent that says that there was a three-year period to correct any issues, that your clients could have corrected themselves within three years, and so that the statute of limitations, whatever it is, shouldn't begin until 2010. Did you respond to that? We did, but that's it. Where? We didn't respond to it in this court. Okay, so where is that? I can't cite to the page. Tell me what the response is, because I didn't see it. However, the response is this. That was an egregious argument, egregiously bad argument. Mr. Wilson is the one who testified that defendants had a thirteen-year statute of limitations, and where he got that was by reaching into elevation grant contracts. In elevation grants, the plaintiffs were given . . . not the plaintiffs, but the road home applicant recipients of the funds were given three years to elevate. Nothing of the sort appears in the homeowner's grant cases. This is a homeowner's grant case. What's in the contract for the elevation grant cases cannot be brought into this case, and that was a bad mistake to assume that they had thirteen years, assuming state law applies. I think the most important question before this court is whether federal law has preempted the field in 28 U.S.C. Section 2415, which finds a six-year statute of limitations for agents of the federal government, and these defendants and the state was an agent of the First off, to hear defendants describe it, the state received billions of dollars by the government, was given the authority to administer, and told, enjoy. That is not what the record demonstrates. First off, Congress's appropriation went not to the states, but to HUD, and in the Congress held HUD answerable to compliance with federal law. It made specific reference to the Stafford Act, which provides that when duplication of benefits occurs, that creates a liability to the United States. Moreover, it is the agency creating the liability, in this case HUD, who is responsible to make that recovery, and for that reason, HUD, before it began funneling any funds to the states, published book-length regulations about the proper uses and handling of these CBBG funds, and before a penny was paid out to any state, HUD insisted that the state have a detailed action plan saying what it would do, and that action plan was subject to HUD's approval. That action plan is what the state was authorized to administer, but the administration could not depart from the action plan that HUD approved. Also, the state was monitored closely by HUD throughout, and everyone understood that the price of noncompliance with federal law could mean the loss of these federal funds. Essential to the action plan was the state's obligation to recapture duplicate funds for HUD. Defendant's contract to do exactly that, which was paid for, defendant's contract paid for by federal funds, made particular reference to the possibility of onerous federal penalties being applied if they didn't recapture duplicate funds. They reported all of their actions, costs, and collections to the state, sometimes on a daily basis, on programs, also paid for by HUD, to which HUD had ongoing access. Most tellingly of all, every dollar recovered by these defendants went into a special account earmarked for HUD purposes or directly to the U.S. Treasury. The Thornburg case held that a bank which recovered funds for the SBA was subject to the six-year federal statute of limitations because the bank was acting as an agent of the SBA. Defendants tried to distinguish Thornburg on the ground that the SBA had assigned the funds for collection to the bank. Here, the relationship is even more direct. The state was obligated by law and by contract to recover for HUD funds that belonged to the federal government. In the state's own documents and pleadings, and in HUD's documents, they expressly referred to these funds as HUD's and to the state as agents of the federal government. Only these defendants have the effrontery to argue that that was not the case. In enacting Section 2415, which we think preempted the field, Congress made its intentions clear. It did not want the government to be answerable to multiple statutes of limitations in different jurisdictions, and it had determined through the comptroller that six years would be enough for federal purposes. Indeed, in this case, six years should have been enough. Remember, the state was told of the duplicate benefits in 2007. The state acknowledged it knew of the duplicate benefits in 2008. It hired defendants to recover the duplicate benefits in 2009, and in 2011, HUD, already deeply concerned about the delays, issued yet another regulation admonishing the state that duplicate benefits were to be recovered upon discovery. And yet, these demand letters did not go out until 2017 and 2018. Defendants argue that the government should have the benefit of Louisiana's 10-year statute of limit. How much did Ms. Randolph pay? She pays $25 a month. What's the total? The total she has paid in to date is $1,000. At this point, HUD has recently shut down the entire Road Home Program. You may have heard that in the news. It's something you could take judicial notice of, and one has to believe that this lawsuit and the showing of defendants' mistakes played a part in that decision by the federal government to call off the whole program, but it did not make up for all the harms that were done, because even though Ms. Randolph doesn't have to pay further on her alleged debt, which never really was a debt, she doesn't get back the $1,000 that she's paid in. So defendants say that the 10-year statute should apply. Congress had a bigger picture in mind. What's clear in this case is that among the other states receiving these same CDBG funds, Mississippi's statute of limitations was three years. I thought maybe you were wrapping up, but you're talking on, so you've saved time for rebuttal. Thank you. All right. We're going to hear from David Daly or Daly? Daly. Daly? Okay. Good morning, Your Honor. It may please the Court. David Daly, on behalf of all the defendants. Mary Catherine Daly, John Shetty, John Shetty Walsh, Shows Daly and Walsh. I think that, as my opponent did, the first threshold issue is the standing issue. And so in coming up, preparing for this, I kept looking at the original petition, the original complaint, sorry, and noticed that it doesn't meet any of the tests of any of the cases that are cited. Right. But what case says the petition or complaint has to actually say it as opposed to it has to actually exist at that time? I mean, what case says that if the complaint didn't say the right word, we're done, even if the party did have the standing, just wasn't written out well? And I would suggest that they don't meet what the standard ought to be. I know under Perez and then some of the other circuits. But what the courts have said is that we have to determine from the start of the case whether or not there's a concrete injury and thus whether or not they're standing. And the only way you can do that is to look at the complaint allegations. If what we're going to say is we look at the complaint allegations and then they can make any amendments or submit affidavits, that would swallow the rule. And like the courts in that. Counsel, have you ever read 28 United States Code 1653? 19, I'm not sure which one that is. Ring a bell. I'll read it to you. It's very short. Quote, defective allegations of jurisdiction may be amended upon terms in the trial or appellate courts, period, end quote. I understand, Your Honor. And what the courts have said in the Walters v. Edgar case, the court said, look, we have to look at whether or not there's jurisdiction at the start because we can't. 100%. You're absolutely correct. And there's no dispute in this case that all of the allegations of injury existed at the time of the complaint being filed. In fact, they existed in 2007. And I don't understand at all. You may have a point that they need to move under 1653 and amend the complaint and add the emotional distress stuff, but this borders, in my view, I'll be honest with you, on frivolity. And I'm deeply troubled that you would rely on Perez and say, oh, I'm going to raise a standing allegation, a standing problem now. And you don't quote the part of Perez that literally says where a plaintiff comes forward and says, I've suffered emotional distress, that satisfies both TransUnion and Article III. They have that evidence here. One of the plaintiffs paid $1,000 from her pocketbook. That clearly satisfies the standing requirements. And it's not a Rule 12 case. We're not here on motion to dismiss. Judge Haynes asked you for a case that says, why do we care about anything you're talking about when we're here on summary judgment? I've given you a statute passed by the United States Congress that lets them amend the complaint and conform it to the evidence. The evidence is irrefutable. Perhaps we should move on. That's my own view. Maybe my colleagues have other questions on standing, but I certainly do not. Thank you, Your Honor. And I do apologize, Your Honor, for that. I think the second issue is whether or not what they've alleged is sufficient and whether or not saying we had emotional distress from the letter. We've all looked at and read cases on the FDCPA and why it was promulgated, the conduct that it was designed to prevent, the harassing phone calls at all hours of the night, the letters that, you know, threatened all kinds of actions that they couldn't take. This is not that case. Your Honors have the letters. You've seen them. There's no phone calls. There's no other allegations of meetings or late-night communications or anything. But if you're not a lawyer and you're sitting in your house and all of that kind of stuff, and then you get a letter that makes you think your house is going to be taken from you, that could be upsetting, frankly, even for a lawyer, but much less for someone who doesn't have any sense about how can I fight this, what can I do about this, and all of that. You're just a person. I understand. And my point with that is that that is an allegation, a conclusory allegation, that can be made in every single case. So the rule will now be swallowed because regardless of what stage it's at, it's just going to be met with an amended petition, amended complaint, or an affidavit in opposing the motion. And so the Perez case and the most recent one. Well, I mean, at trial they would have to prove the emotional distress, and if the person was still out partying, having a good time, doing everything under the sun, never said squat about it to anyone, then that might kind of push that back and say, well, no, you just threw this letter away. You didn't care about it. You're making up the fact of emotional distress just so you can mess with these people and hope to get some money or whatever, right? So, I mean, certainly there are plenty of people who would get a letter like that and throw it away and would not have emotional distress, so you can't lie about it. But people could. They're sitting there maybe by themselves, maybe they've lived more than a few years in life, and get very upset and scared, and that kind of person does have standing, right? Well, I would suggest that bare allegations of emotional distress are not sufficient. After we briefed this case, there was a Seventh Circuit case that came out called Choice v. Cone Law Firm. It's another FDCPA case against lawyers. The site is 77 Federal 4th 636. Not directly on point with this, I will mislead the Court, but the allegations that the Court found were not sufficient, and there was an actual suit filed in that case, so there was not the specter of a suit. The plaintiff had hired an attorney and paid an appearance fee and wrote in there that she was concerned, worried, confused, and lost sleep. And the Court said, those emotional harms are insufficient. But the tort of emotional distress is, this isn't debatable, right? I mean, TransUnion says it and Perez says it. So the sentence you omitted from the brief that is in Perez, quoting TransUnion, says, quote, a plaintiff can sue for damages if the risk materializes, that's the risk of, in that case, the credit reporting, or causes a separate injury in fact such as emotional distress, end quote. So that's in Perez. That is the standard here. We're not in the Seventh Circuit. That's the standard here in the Fifth Circuit. They have come forward with evidence to show that they meet the elements of the common law tort of emotional distress. As Judge Haynes points out, it's quite easy to understand why that would be so. So I'm not sure I understand what any of this has to do with anything. All right. I'll move on. You're on. So the next argument. I wanted to ask about this three-year thing that you said and your opponent says is a ridiculous argument, that they had three years to fix whatever they've done wrong, they being the plaintiffs, and therefore you said that your statute of limitations shouldn't begin to run until three years after they receive the funds. So in your brief it says 2010. What is your response to her saying that's ridiculous and so on? Well, there's testimony on the record from the Road Home Program, people that they'd opposed, Mr. Haley and Mr. Reese, that talked about that. And it was that this program, their desire was not to sue Louisiana residents. They were trying to work with them to get them compliant. And so they, as a matter of practice, said, we're not doing anything in elevation or these other grant cases for three years. We're going to send them letters. We're going to call them. We're going to make sure that they understand what's going on, give them this time to try to get compliant with the thing because we don't want this to go on. She's saying it doesn't apply in this bucket. Well, the testimony is that it applied to both. Okay. So as far as whether or not her position, I'm sorry, I think that's incorrect. But in any event, and then there was the efforts by the lawyers to try to go ahead and collect on these. And there weren't harassing phone calls. It was just the letter. So the next item that they raised, which she didn't address, was the itemization of damages. I don't know if you want me to address all those. I think I want to understand the time because if y'all were past the time and there's no argument to the contrary, that's a problem. I mean, we'd have to reverse and remand at least on that. The time meaning the tenure? Well, that's what I was going to turn to next. What is the proper statute? Why do you argue the 10-year Louisiana statute instead of the six-year federal statute? I don't think there's any dispute but that the contract, the issue here, was between a Louisiana resident and the state of Louisiana agency. The funds were, according to the grant documents, the funds were to be designated by an entity designated by the governor of Louisiana. We have the Louisiana Recovery Act. You have the Road Home Program, which was created by statute. You have the Office of Community Development, which is a Louisiana agency. They formulated the grants. They formulated the requirements, how much it was going to cost. And they entered into these contracts. They formulated the contracts. They met with the Louisiana residents. They went to closings with the Louisiana residents. They communicated, asked questions, did inspections if they were required. And they were the ones who handled all of this on the ground level. There was no federal agent sitting at the desk at this closing. There was no federal agent sitting at a desk at the Road Home Program. So I disagree with that. And I would suggest that this was a Louisiana operation because the federal government wanted that. The federal government could have easily said, I'm concerned about Louisiana statute limitations, prescriptive periods, versus Mississippi, versus anything that Louisiana does, versus other states that might be different. We're handling this ourselves. We're going to go ahead and start a program. We're going to call it whatever we want to call it. And they will handle these distributions. But instead they said, we think each state individually has a better handle on what its citizens need, what goes on in those states, how things get done in those states. So we're ceding that to them. And I think that's why the U.S. v. Orleans case that was in the Olive Reefs and the Castro case as well deal with whether the question of whether or not there's preemption of the field by the federal government. They easily could have done that. But they chose not to. And the evidence has to be clear and convincing that they wanted to preempt the field. They wanted their statutes to put. There's no evidence of that.  So y'all take over this. The Orleans case says it doesn't matter that they're providing the funds. All the cases we cited, they provide the funds. The federal government provides the funds for these programs. But they're controlled on a day-to-day basis by Louisiana. And that's what Orleans' analysis says, that because there's no day-to-day control, the federal government is not, these companies, I'm sorry, these Louisiana agencies are not magically transformed into federal agencies. But let's just assume you're right about everything you just said. And suppose it's a 10-year limitations period. I guess I have two questions. One is what, if anything, did your clients do to confirm that you had timely debts or you had timely dunning letters on collecting these debts? And then number two is why is it that not every single thing done by your clients was barred by the 10-year limitations period? Just assume the 10-year limitations period applies. There's no later limitations period. No. So it's 10 years or less. And it looks like your clients should have known that these debts were time-barred at the time that the letters went out. So number one, what did they do to confirm? And number two, why is that wrong? Well, the only thing they could do to confirm was ask their client when the information was discovered because they did not have access to the database that you've heard discussed. And did they ask their client when the evidence was discovered? Yes. Well, yes. Whenever they'd get a file in, they would say, okay, what's the relevant dates on this? And their client would say, this was discovered on March blah, blah, blah. And what's the record site for when your clients asked the State of Louisiana for the discovery date of these debts? The record shows their deposition testimony where they stated the only way we could find this is to ask our client when the file came to us. Completely. And I've read this Haley Affidavit where it says that you couldn't do the searches on your own, so I'm familiar, and what I'm asking you is a different question, which is where did the law firm ask before sending out the Dunning letters, where did they say, hey, listen, we're getting ready to send out some letters, and we're going to demand payment of debts, and we want to make sure that before we do that that we have a lawful right to collect on the debts. So can you please let us, because they sure look old to us, and we just want to make sure we think it's a 10-year limitations period, can you just assure us that we're on good ground before we discharge our legal obligations and send out these Dunning letters? Where is that in the record? That's in the deposition testimony that they took of my clients.  No, they say that we asked our client, when did you get this information? Are we within the 10 years? And they were told by their client this information was discovered on such and such dates, and then they do the math and say, okay, we're timely. So according to my notes, and I'm looking at the record, 7702 to 7703, these purported overpayments are disclosed in the summer of 2007, way more than 10 years before. At all. Give me an example of one that wasn't. Ms. Randolph's. Ms. Randolph's, her information was not reported until later. When? I'll have the data on it. It's within the 10 years. Are you talking about the State Farm payment? Yes. The State Farm payment? Into the database that they're claiming provided the information that would start the running. That information from Ms. Randolph was provided within the 10-year period of the letter. And that's important because it shows that the information was provided coming in on a rolling basis. It's not like, okay, on March 1st of such and such a year, we had all the information, so all we had to do was go in and type a query and figure out, okay, this is what the answer is. Somebody at the State of Louisiana could have figured out that these claims were time-barred before you sent out the letters, correct? Before we sent out the letters, yes, but not 10 years more than before we sent out the letters. Well, maybe we should do the plaintiffs one by one because I agree with you that the records, that they are slightly different. So as to Ms. Calagaro, her claims are indisputably time-barred. Your ability to collect on that debt is indisputably time-barred is a better way of asking it. Do you disagree with that? Absolutely. And how is that true? Just Ms. Calagaro. For Ms. Calagaro, the information was discovered by the State, and they sent the letter within 10 years of that date. And what is that date? It's March of 2008. When the contractor flags it in the payment database. When they did an investigation and found that the information that had gone into the database was inconsistent with what she had provided on her application. So the payments that we're talking about, the ones that you're claiming are the purported overpayments to Ms. Calagaro, they were made in October and November of 2005. They were reported to the State's database in July of 2007. That's undisputed. All you're talking about is that someone actually went in and did a query and then put a little flag on it later. But it was in the database in July of 2007. Am I misunderstanding? It was in the database along with information regarding hundreds of thousands of people that was coming in on a regular basis. My point is that if, let's say, for example, you run the query for every person on March 3rd. So you're going to catch some people, but you're not going to catch people that come in the next day or the next day. So you have to run the search every single day. So I don't think it was unreasonable for them to have run this query and got the information within the time period. And as far as Ms. Randolph goes, it wasn't possible. It wasn't even in the system. Until October. Until within 10 years, yes. Three months later. Within the 10 years, yes. Right. And even as to her, as to Ms. Randolph, the 10-year period would have expired before the 90 days referenced in the letter, right? Because the letter says we're going to see you in 90 days, which would have been after the 10-year period, correct? After the math, that may be correct, yes. Yeah. So even as to her, you have a time period problem. And none of this was confirmed before we sent out the letters. It was confirmed that that's when the information was recovered by their client, yes. Because you asked somebody at the State. That's the only way I could get the information, yes, Your Honor. Okay. And you also think that even if the 10 years was earlier, that there is some discovery issue for you, and that's what you're arguing with Judge Oldham. And then you also have this three-year add-on. But I didn't see a lot of discussion about the three-year add-on. Because if the three-year add-ons there and the 10-year applies, then, yes, you all were timely, no question. And there was also a state that was created by the legislature where the legislature said you can't collect on these things, we're doing a moratorium. But I don't think any of that is needed because as far as the information that was provided, they were within the 10 years for both. So is your point, you know, you all, your people, your clients are the ones being sued, not the State, obviously. And if they, the only way they can get information is from the State, and the State gives them the wrong information, they still should not be able to be sued because they did what they could do. Is that your argument, basically? That's not, I mean, that's not my thought. Responding to Judge Oldham, because Judge Oldham is saying the State could have found it sooner. Let's assume that's true. But the State says, no, we found it on March 2008. You're saying we had to accept that. That's our client, essentially, the State. That is true. We being the show's callee group. But I'm also saying that the State, it wasn't possible for the State to learn the information on a daily basis about every single Louisiana citizen. That's just not a possibility. I don't know of a program that could do that. You'd have to run every person's name every single day to figure out when that information, because remember, they don't control when the information comes in. That's controlled by State Farm or, you know, any other entity that was providing funds. So. Okay. Well, your time's up. Thank you. Unless you probably have more questions. Okay. Thank you. And now we'll hear the rebuttal. I don't know if I can do this in five minutes, but I'll try. Mr. Daley is arguing way outside the record. He is not arguing about what was actually said in deposition. And the license that defendants have taken with the facts throughout this litigation is betrayed by their failure to cite to the record for statements that they make throughout the brief. Here you asked about the three years. The three years is preposterous. Yes, Mr. Wilson testified to it, but that just discloses his ignorance, because you have a record, the contracts, all of them, in the road home cases. There is no contract for the homeowners who are the plaintiffs at bar that has a three-year compliance period. And nobody but Mr. Wilson and their firm said it applied to both kinds of elevation and homeowners' cases. They couldn't make that argument because it's a matter of contract. The elevation grants say that, the road home, homeowners' cases do not say that. To understand the date on which prescription should have commenced to run, you have to understand the state's data systems. Mr. Daley is pretending ignorance about the data systems. What we know is that the state hired IT people to manage the huge wealth of data that came in on more than 100,000 road home applicants, all of which went into something called the data warehouse. The e-grant program designed by the state's IT contractors was specifically— Well, let me ask you this. I mean, in this current world, everything in the world is probably somewhere online, but the notion that that means I know it or you know it is, I think, a little much. And that's what Judge Ash ruled, and that's why I'm glad you're bringing it up and why I want to talk about it. Because the e-grants program, which was in use every day by everyone, was specifically designed to provide the state access with any information it needed out of the data system. You did not have to run searches every day. All you had to do was cue in the questions of what the state needed to know. And the clincher about the error made by Judge Ash is when he looked at what you have in front of you as Exhibit 1. You're looking at the screenshot of the e-grants program on Ms. Calagaro. That's where that March 1, 2008 date appears. That's when the state recorded its knowledge. And the way it got there was that somebody asked the question, what benefits were paid by whom, to whom, and in what amounts? It was all done by computer, and it all popped up on the computer anytime anybody wanted to know anything. The March 1 date that Judge Ash relied upon was itself the product of a normal routine search by e-grants that produced that date. We asked the state, why didn't you know when you first got the information? Because, as Judge Oldham pointed out, we learned from State Farm that they had reported it in 2006 and 2007. Then we learned from ICF that they had date-stamped that material when it came into the system, so they would know the date of receipt. All they would have had to add to this e-grants inquiry was when. We asked the state, why didn't you ask when? The state said, we gave all these files to defendants. They were our attorneys. We didn't treat with issues like prescription. That was for them, but we told them we would give them any information they needed. So when we asked the defendants, why didn't you ask? The answer was, we just didn't. We didn't ask. That does not pass the due diligence requirement of contra non voluntum. Thank you, Your Honor. Do you have any other questions? I could go on for hours. I'm sure you both could, but that's okay. Just to allow for the time taken up by the questions, can I have 30 seconds? Well, look, I think you're done, but thank you. I mean, yes, we could take hours, but I don't think 30 more seconds is needed, but thank you for your time. And the case is under submission.